PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMMY ADKINS; GERRIT J. ALLEN;
DANIEL ANDERSON; WILLIAM ARNOLD;
DONALD O. AUSTIN; ROBERT M.
BALICK; CHARLES A. BARAT; RICHARD
A. BECKER; PAUL A. BRANDMIRE;
RICKY L. BRENNAN, SR.; ROBERT D.
BUXTON; JOHN CAPEWELL; PHILIP P.
CASALE, SR.; WILLIAM F. CONROY,
III; FREDERICK A. COOK; RONALD L.
DEMING; WILLIAM H. DRAWBOND;
BRIAN D. DUNN; CLIFFORD C.
ECKERT; STEPHANIE A. EECKHOUT;
SHERRY E. FANCHER; WENDELL D.
FARRIS; RICHARD D. FERRELL; TERRY
P. FLETCHER; ROBERT FRICK;
MAURICE R. GAGNON; GREGORY L.
GOINS; STEVEN M. HANGER; GREGORY
HARRIS; JACKIE D. HAWKINS; BRIAN
J. HENDRICKS; DIANE HOBBS; JAMES
WILLIAM HUNTER; WILLIAM PAUL
KENNEMER; WILLIAM J. KOSELKA;
ROGER LEDBETTER; JAMES W.
LOBERG; KENNETH MANRING; STEPHEN
MONKS; FREDERICK NEHRINGS; JOHN
B. NOONE, JR.; EDWIN E. OSTROOT,
II; STEVEN PERRIN; MARVIN L. POTTS;
LORRAINE C. REIS; RONALD A.
RESARE; DONALD E. ROTUNDA;
MICHAEL SPEIR; LLOYD E. STANTON,
JR.;

No. 05-2307

MARVIN G. STROUD, JR.; ROBERT W.
THROCKMORTON; GLENN UDART;
MICHAEL VARELA; MICKEY WRIGHT;
DOROTHY J. YARDE; GEORGE
ZAMORA; CARROLL ZIMMERMAN;
ULSG, LLC; BRUCE PAQUETTE;
ARTHUR WILSON,
                    *Plaintiffs-Appellants,*

                    v.

DONALD H. RUMSFELD,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-04-494-JCC)

Argued: May 22, 2006

Decided: September 18, 2006

Before WIDENER and MICHAEL, Circuit Judges,
and Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge Michael wrote the opinion, in
which Judge Goodwin joined. Judge Widener wrote a separate con-
curring opinion.

**COUNSEL**

**ARGUED:** David Jeremy Bederman, EMORY UNIVERSITY
SCHOOL OF LAW, Atlanta, Georgia, for Appellants. Dennis Carl

Barghaan, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Jonathan L. Katz, MARKS & KATZ, L.L.C., Silver Spring, Maryland, for Appellants. Chuck Rosenberg, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

The Uniformed Services Former Spouses' Protection Act (Act) gives states the option to classify a United States armed forces member's disposable military retirement pay as property divisible upon divorce. Pub. L. No. 97-252, 96 Stat. 730 (1982) (codified as amended at 10 U.S.C. § 1408). In addition, the Act establishes a payments mechanism allowing an eligible former spouse to receive the share of the retired pay directly from the military pursuant to a state court order in divorce proceedings. *Id.* In this case current and retired members of the armed forces whose retirement pay has been divided in state divorce proceedings, and an association representing such members, sued the Secretary of Defense. The plaintiffs allege that the Act and the regulations implementing it violate their constitutional rights to due process and equal protection of law. They also allege that the Act fails to respect the principle, purportedly rooted in the Constitution's Armed Forces and Full Faith and Credit Clauses, that legislation concerning military pay must have nationally uniform effect without variations among the states. The district court dismissed the individual plaintiffs' claims for lack of subject matter jurisdiction, reasoning that these plaintiffs impermissibly sought appellate review of their underlying state court divorce decrees. The court later dismissed or granted summary judgment to the Secretary on all of the association's claims. We conclude that the district court correctly rejected the association's constitutional challenges, and we also conclude that the individual claims cannot succeed, even though the district court had subject matter jurisdiction over them. We therefore affirm.

## I.

### A.

To be eligible for retirement pay, members of the uniformed services must generally serve for a specified length of time, usually at least 20 years. *See* 10 U.S.C. § 3911 *et seq.* (Army); § 6321 *et seq.* (Navy and Marine Corps); § 8911 *et seq.* (Air Force). Members also face a mandatory retirement age of 62 regardless of how long they have served, subject to certain exceptions. 10 U.S.C. § 1251. The amount of retirement pay is usually a product of two factors: the number of years of creditable service and a fixed percentage of the member's "pay level achieved at retirement." *Barker v. Kansas*, 503 U.S. 594, 599 (1992); *see* 10 U.S.C. §§ 1406-07, 1409 (setting forth rules for computation of retirement pay). Federal law may impose obligations on members even after retirement. Many retirees remain members of the Armed Forces. *See, e.g.*, 10 U.S.C. § 3075(a) (Army); § 8075(a) (Air Force). They may in some circumstances be recalled into active duty, *see* 10 U.S.C. § 688, and they may not violate the provisions of the Uniform Code of Military Justice, *see* § 802(a)(4). These obligations, though significant, do not imply that military retirement pay is to be regarded for all legal purposes as compensation for reduced job activities during retirement. In some contexts this pay may instead be viewed as "deferred compensation for past services," *Barker*, 503 U.S. at 603, just like ordinary public sector employee pensions. Divorce is one example. *Id.*

The division of spousal property upon divorce is usually a question of state law. "The whole subject of the domestic relations of husband and wife . . . belongs to the laws of the States and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593-94 (1890). But application of state family law under some narrow circumstances cuts into substantial federal interests and must yield to federal law under the Supremacy Clause. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581-83, 590 (1979). The Supreme Court identified one of these circumstances in *McCarty v. McCarty*, 453 U.S. 210 (1981). There the Court found an irreconcilable conflict between the federal statutes governing military retirement pay — which the Court construed as making retirement pay the property of the retiree — and state law that treated pay earned during marriage as divisible spousal property. The

Court went on to hold that state law could not be allowed to divide a military retiree's retirement pay in divorce proceedings. *Id.* at 232-33. That is, the retiree's former spouse could not receive a share of the retiree's retirement pay. Remarking that the "plight of an ex-spouse of a retired service member is often a serious one," the Court emphasized that its determination was subject to legislative correction: "Congress may well decide . . . that more protection should be afforded [such] a former spouse . . . . This decision . . . is for Congress alone." *Id.* at 235-36.

Congress made exactly that decision in passing the Uniformed Services Former Spouses' Protection Act. The statute provides that subject to specified limitations "a court may treat disposable retired pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse *in accordance with the law of the jurisdiction of such court*." 10 U.S.C. § 1408(c)(1) (emphasis added). Disposable retired pay is the total monthly retired pay less certain deductions, § 1408(a)(4), and no more than half of the retiree's disposable retired pay may be awarded to the former spouse as divisible property, § 1408(e)(1). Retirement pay waived to receive disability benefits is excluded. § 1408(a)(4)(B); *Mansell v. Mansell*, 490 U.S. 581, 594-95 (1989). Although it was signed into law on September 8, 1982, and became effective February 1, 1983, the statute expressly covered payments to retirees after June 25, 1981, the day the Court handed down *McCarty*. Congress later clarified that former spouses could not seek a share of retired pay if their divorce or separation became final before June 25, 1981, and the state court did not "treat (or reserve jurisdiction to treat) any amount of [the] retired pay of the member" as divisible property. 10 U.S.C. § 1408(c)(1).

By referring to the "law of the jurisdiction" of a court issuing a divorce order, § 1408(c)(1) unambiguously leaves to the states the choice of whether to treat disposable retired pay earned for service during marriage as divisible property. *See also Barker*, 503 U.S. at 603 (describing the Act as "giving the States the option of" dividing such pay). It appears that nearly every state has elected to treat military retired pay as divisible marital property. *See generally State-by-State Analysis of Divisibility of Military Retired Pay*, 2002 Army Law. 42. Nevertheless, a division under § 1408(c)(1) can only be

made by a state court that has "jurisdiction over the member" based on residence, domicile, or the member's consent. 10 U.S.C. § 1408(c)(4).

Another provision of the Act created a "payments mechanism," *Mansell*, 490 U.S. at 585, under which the military directly transmits to former spouses the share of retired pay to which they are entitled under state court divorce decrees. *See* 10 U.S.C. § 1408(d). To be eligible for the direct payments, the former spouse must have been married to the member for at least 10 years, and during the marriage the member must have completed at least 10 years of creditable military service. § 1408(d)(2). A former spouse initiates the direct payment process by serving upon the Secretary concerned a state court order "specifically providing for the payment of an amount of the disposable retired pay." § 1408(d)(1). The court order must be "regular on its face," § 1408(b)(1)(B), which means that it "is issued by a court of competent jurisdiction," § 1408(b)(2)(A), and contains no indication that it was issued without legal authority, § 1408(b)(2)(B)-(C).

A Department of Defense (DOD) regulation issued pursuant to congressional authorization, 10 U.S.C. § 1408(j), sets forth further details of the payments mechanism. *See* DOD Financial Management Regulation, Volume 7B, Ch. 29, DOD 7000.14-R (July 2005), *available at* www.dod.mil/comptroller/fmr/07b/07b_29.pdf. After a former spouse submits a certified copy of the state court order, the DOD's Defense Finance and Accounting Service (DFAS) must verify that the order satisfies the statutory requirements. *Id.* ¶ 2906. If the order adjudicated the right of a member who was on active duty and not represented in court, the order must certify that the court afforded the member the procedural protections due under the Servicemembers Civil Relief Act (SCRA), 50 App. U.S.C. § 501 *et seq*. *Id.* ¶ 290602. If, however, the court order is regular on its face, DFAS does not further review the case to determine whether the rendering court had personal jurisdiction over the retiree. *Id.* ¶ 291003. Within 30 days of effective service of the order, DFAS must notify the affected retiree in writing. *Id.* ¶ 290901. The retiree is entitled to respond, and DFAS "will not honor the court order if it is defective or is modified, superseded, or set aside." *Id.* ¶ 290903. The retiree or the former spouse may later file a request that DFAS reconsider its decision regarding the court order based on specified reasons. DFAS must "respond to

the request for reconsideration, giving an explanation of the determination reached." *Id.* ¶ 2912.

B.

The 58 individual plaintiffs in this case are either retired armed service members drawing retirement pay or active duty members who will be eligible for this pay on retirement. On various dates between 1978 and 2003, these 58 individuals were all divorced. They are subject to state court divorce orders granting their former spouses a portion of their retirement pay. DFAS makes direct payments to the former spouses of at least some of the plaintiffs. The plaintiff association is the Uniformed Services Former Spouses' Protection Act Litigation Support Group, or ULSG, a non-profit limited liability corporation. It has nearly 2,500 members, about half of whom have donated money to the association.

The plaintiffs sued the Secretary of Defense in April 2004 in the U.S. District Court for the Eastern District of Virginia. They sought a judgment declaring (1) that the Act violates the members' rights under the Equal Protection Clause and the substantive and procedural components of the Due Process Clause and (2) that the Act is unconstitutional because it allows state courts to apply it non-uniformly. The district court granted the Secretary's motion to dismiss. *Adkins v. Rumsfeld*, 370 F. Supp. 2d 426 (E.D. Va. 2004). The court concluded that it lacked subject matter jurisdiction because it understood the plaintiffs to be seeking federal appellate review of the state court orders in their divorce proceedings. *Id.* at 429-33; *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 416 (1923)). In the alternative, the district court concluded, among other things, that the individual plaintiffs lacked standing to proceed in federal court. 370 F. Supp. 2d at 432. The court also concluded that the ULSG lacked associational standing because none of its individual members had standing. *Id.* at 433.

On the plaintiffs' motion to alter the judgment, *see* Fed. R. Civ. P. 59(e), the district court granted ULSG leave to amend the complaint to allege associational standing. Once the amended complaint was filed, the Secretary moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. In March 2005 the district court

concluded that an affidavit submitted by a ULSG member was suffi-cient to show that ULSG had standing to bring the equal protection, procedural due process, and uniformity claims. The court held, how-ever, that ULSG could not proceed with its claim that the Act violated the substantive component of the Due Process Clause by retroactively reaching the retirement pay of service members who joined before the Act's passage. The court based this determination on the date the affi-ant joined the military, which was long after the Act's effective date. Reaching the merits, the district court went on to dismiss ULSG's equal protection claim and the uniformity claim, but allowed the pro-cedural due process claim to go forward. Both sides moved for sum-mary judgment on that surviving claim, and in October 2005 the district court granted summary judgment to the Secretary. This appeal challenging the district court's dismissal and summary judgment orders followed. Our review is de novo.

## II.

We must examine at the outset whether the district court erred in holding that it lacked subject matter jurisdiction over the individual member's claims. Congress has vested only the Supreme Court with jurisdiction to review state court decisions. 28 U.S.C. § 1257. The *Rooker-Feldman* doctrine, a corollary to this rule, prohibits "lower federal courts . . . from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 126 S. Ct. 1198, 1201 (2006) (per curiam). The Supreme Court has recently underscored that *Rooker-Feldman* is a "narrow doctrine." *Id.* It deprives district courts of subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments ren-dered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Formu-lated in this way, the doctrine forbids claims that "seek[ ] redress for an injury caused by the state-court decision itself" because they "ask[ ] the federal district court to conduct an appellate review of the state-court decision." *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006). In other words, the doctrine applies "where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court." *Lance*, 126 S. Ct. at 1202. (The dis-trict court in this case ruled before the Supreme Court decided *Exxon*

*Mobil*. It therefore applied our then-governing decisions, which had given the doctrine an "expansive interpretation," an interpretation now "reined in" by the Supreme Court. *Davani*, 434 F.3d at 718.)

The Secretary argues that the individual claims fall within even the narrowed doctrine because the plaintiffs lost in state divorce court proceedings before bringing their federal suit, and because their injury was ultimately caused by the adverse state court judgments. We need not decide whether we agree with that description of the claims because at least some of the individual plaintiffs — the ones whose pay DFAS redistributes — are not attempting to appeal unfavorable state court decisions. That is, even if these plaintiffs were "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced," as the concurring opinion takes them to be, *post* at 23, they were *not* "inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. These plaintiffs seek a declaration that the Act is unconstitutional as applied to them. The Act applies to these plaintiffs by requiring the Armed Forces to transmit payments to qualifying former spouses pursuant to state court divorce decrees. *Supra*, part I.A. A federal court declaration that the Act is unconstitutional would invalidate the statutory basis for the federal payments mechanism and effectively prevent DFAS from continuing to transmit payments based on a state court decree. Such a declaration would not, however, amount to appellate reversal or modification of a valid state court decree entered in an individual plaintiff's divorce case. At bottom, an examination of the federal constitutional challenge presented here against the Act does not require scrutinizing and invalidating any individual state court judgment. Contrary to the view expressed in the concurring opinion, the test is not whether the relief sought in the federal suit "would certainly upset" the enforcement of a state court decree, *post* at 23, but rather whether the relief would "reverse or modify" the state court decree. *See Exxon Mobil*, 544 U.S. at 284 ("Among federal courts, the *Rooker* Court clarified, Congress had empowered only [the Supreme] Court to exercise appellate authority 'to reverse or modify' a state-court judgment.") (quoting *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923)). Or, to put it another way, when the plaintiffs asked the district court here to declare the Act unconstitutional, they did not thereby "call[ ] upon the . . . [c]ourt to overturn an injurious state-court judgment." *Exxon Mobil*, 544 U.S.

at 291-92. As a result, the individual plaintiffs whose retirement pay is currently redistributed by DFAS are not "in effect . . . appeal[ing]" their state court divorce "decision[s] to a lower federal court." *Lance*, 126 S. Ct. at 1202. The *Rooker-Feldman* doctrine, contracted as it has been by the Supreme Court's recent decisions, therefore did not deprive the district court of subject matter jurisdiction in this case.

Our reading of the claims also shows why the case presents a justiciable controversy in that the individual plaintiffs and ULSG have standing — a matter we must be assured of, even if it is uncontested on appeal. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). To satisfy the standing requirement, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The plaintiffs contend that when DFAS transmits a portion of a service member's retirement pay to a former spouse pursuant to the Act, DFAS effects a transfer of the member's property. That transfer allegedly inflicts a direct economic harm upon the member that is concrete and not hypothetical. *See, e.g.*, *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 386 (4th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The money transfer follows directly from, and hence is traceable to, DFAS's obedience to the Act; moreover, the injury could be redressed because if a federal court were to declare the Act unconstitutional, DFAS would have to cease making the transfers. The individual plaintiffs whose apportioned retirement pay is dispensed through the Act's payments mechanism therefore have standing to proceed in federal court. *See, e.g.*, J.A. 119 (alleging that "automatic deduction payments are made to [plaintiff Richard A.] Becker's ex-wife from his retired pay by DFAS"); J.A. 121 (raising identical allegation for plaintiff William F. Conroy, III). Further, because the ULSG members whose retirement pay is dispensed to former spouses under that mechanism have standing, ULSG satisfies the requirements of associational standing. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Because we conclude that federal subject matter jurisdiction is present, we may proceed to the merits of the constitutional claims.

### III.

The plaintiffs challenge the district court's dismissal of their claims invoking substantive due process, the alleged need for uniformity in rules governing military affairs, and equal protection.

### A.

The Act does not exempt service members who joined the armed forces prior to its enactment from state court divorce decrees dividing their military retirement pay upon divorce, nor does it exempt these members from the federal payments mechanism that DFAS administers. The service members who joined the military before the statute's enactment allege that the lack of these exemptions retroactively alters the compensation they expected when hired. They contend that this retroactivity amounts to a violation of the substantive component of the Due Process Clause of the Fifth Amendment. The district court did not resolve this claim because it erroneously concluded that it lacked subject matter jurisdiction. The error has no practical consequence for the claim, however, because the claim fails on the merits.

"[T]he retroactive aspects of economic legislation, as well as the prospective aspects, must meet the test of due process," *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (punctuation omitted), because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). The plaintiffs draw an analogy to *United States v. Larionoff*, 431 U.S. 864 (1977), where the issue was the risk of retroactive government action that would be detrimental to military service members. In that case Congress authorized but subsequently repealed a program that paid variable re-enlistment bonuses to armed forces members whose skills the military critically needed. *Id.* at 865-68. One plaintiff-service member in *Larionoff* agreed to extend his enlistment while the program was in effect, but did not begin serving his re-enlistment term until after the program's repeal. *Id.* at 878. The military denied this member a bonus because the program was abolished before his re-enlistment period began. In holding that the member was entitled to the bonus originally promised to him, the Court observed

that Congress gave no indication in repealing the program that it also intended to "divest [the member] of the rights he had already earned." *Id.* at 879.

The plaintiffs cite *Larionoff* in urging us to hold that they are entitled to their undivided military retirement pay. *Larionoff* is a very different case from this one, however. First, the Supreme Court's search in that case for a "clear expression of congressional intent" to alter the rights of members who had extended their enlistments, *id.*, was simply an application of a familiar general rule: "'a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication.'" *Fernandez-Vargas v. Gonzales*, __ S. Ct. __, __, No. 04-1376, slip op. at 5-6 (June 22, 2006) (quoting *United States v. St. Louis, S.F. & T.R. Co.*, 270 U.S. 1, 3 (1926)). This "explicit language" requirement "is a demanding one" that requires statutory language at a "high level of clarity." *INS v. St. Cyr*, 533 U.S. 289, 316-17 (2001). The requirement was not satisfied in *Larionoff*, 431 U.S. at 879, but it is satisfied here. Congress decided that the Act would allow state courts to divide military retirement pay earned after June 25, 1981 (again, the day the Supreme Court handed down *McCarty*) in divorce proceedings. Congress made this decision about the temporal reach of the statute clear in the words of the statute itself. 10 U.S.C. § 1408(c)(1). Where Congress has spoken so clearly about the statute's intended reach, the presumption against retroactivity simply does not come into play.

Next, the "settled expectations," *Landgraf*, 511 U.S. at 265, resulting from the re-enlistment bonus program Congress established and then dismantled in *Larionoff* are not easily compared to those we examine here. As we have emphasized, the Act does not deprive members of their retirement pay. It simply gives state courts the option to divide that pay, and requires the Secretary to enforce state court decisions through direct payments to qualifying spouses. Congress may have promised to pay re-enlistment bonuses of a certain amount to members in the position described in *Larionoff*. The individual plaintiffs here, however, cannot plausibly allege that at the time they joined the military Congress promised to permanently shield their retirement pay from former spouses presenting valid state court orders. Only the Supreme Court's decision in *McCarty* — not any promise by Congress — could arguably have supported the

expectations of some service members that their retirement pay would be shielded in this manner.

Yet even that argument fails. The complaint reveals that none of the individual plaintiffs is entitled to argue that, in the slim window between the *McCarty* decision and the Act's passage, they had a legitimate expectation that their retirement pay would be shielded upon divorce from division and garnishment. Only two plaintiffs in this case allege that they were divorced before the Act was signed into law in September 1982. Indeed, they were divorced before *McCarty* was decided. They are Lloyd E. Stanton, Jr., divorced in Arizona in March 1978, and Carroll Zimmerman, divorced in California in August 1979. Yet the courts of the states in which these plaintiffs were divorced treated military retirement pay as divisible on divorce at the time, *see Van Loan v. Van Loan*, 569 P.2d 214, 215-16 (Ariz. 1977); *In re Fithian*, 517 P.2d 449, 451-57 (Cal. 1974), and the Supreme Court had not yet interpreted federal law as requiring a contrary rule. So even Stanton and Zimmerman cannot claim that the Act deprived them of any expectation based on the *McCarty* holding.

The individual plaintiffs did not state a substantive due process claim upon which relief could be granted. Thus, the district court's error in not reaching that claim does not affect the outcome of the case.

B.

In giving state courts the option to divide military retirement pay upon divorce, the Act tolerates variation among the states in how that pay is actually divided between spouses in individual cases. For example, although Congress provided that the former spouse's share of the member's retirement pay pursuant to an order dividing property may not exceed 50 percent, 10 U.S.C. § 1408(e)(1), state courts are free to award a lesser share as appropriate in an individual case. The plaintiffs argue that the Act "give[s] rise to disparate treatment to service members" and that it "produces non-uniform results when implemented in state law." J.A. 137. This alleged lack of uniformity, they contend, is impermissible under the Constitution's Armed Forces Clauses, U.S. Const., art. I, § 8, cls. 12-14, and the Full Faith and Credit Clause, *id.*, art. IV, § 1.

We disagree. The portion of the Full Faith and Credit Clause the plaintiffs rely on provides that Congress "may by general Laws pre-scribe the Manner in which [state public] Acts, Records and Proceed-ings shall be proved, and the Effect thereof." *Id.* There is no indication that Congress invoked this clause when passing the Act into law, but even if it had, the clause does not impose on Congress any requirement of substantive uniformity in any area of the law. The word "uniform" is nowhere found in this provision, though it can be found elsewhere in the Constitution. *See, e.g.*, U.S. Const., art. I, § 8, cl. 4 (empowering Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States"). As for the Armed Forces Clauses, "'judicial deference . . . is at its apogee' when Congress legislates under its authority to raise and support armies," *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1306 (2006) (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)), and Congress's decision to allow military retiree pay no spe-cial exemption from ordinary state divorce law principles is entitled to precisely this sort of deference. Dismissal of the non-uniformity claim was correct.

## C.

The plaintiffs next argue that the Act violates their constitutional right to equal protection by distinguishing between persons based on three classifications. They first allege that the Act's scheme has a dis-proportionately harmful impact on female service members. This argument attempts to present a sex discrimination claim. The female plaintiffs contend that when Congress enacted the statute it aimed to protect former spouses not employed outside the home (whom Con-gress allegedly assumed were women) at the expense of the service members (whom Congress allegedly assumed were men). The plain-tiffs further argue that although the number of women in the Armed Forces has increased, the statute has not been changed. They allege that allowing the former husbands of female service members to receive a share of their retirement pay is "manifestly unfair," as these former husbands in many cases have their own income. Appellants' Br. at 52. In other words, the plaintiffs contend that the Act discrimi-nates against women in the Armed Forces and in favor of men because former husbands are more likely than former wives to have sources of income other than the divided military retirement pay.

This argument does not state a claim for sex discrimination in violation of equal protection. A statute that explicitly classifies people based on sex is subject to intermediate scrutiny, which means "it must be established at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Nguyen v. INS*, 533 U.S. 53, 60 (2001) (punctuation omitted). In contrast, a statute that does not explicitly classify people based on sex and is thus "gender-neutral on its face," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979), must be assessed under a two-element test before it is reviewed under intermediate scrutiny. First, we ask "whether the statutory classification is indeed neutral in the sense that it is not gender-based," and if so, second, "whether the adverse effect reflects invidious gender-based discrimination." *Id.*

The Act's vocabulary is not sex specific. It refers to service members and former spouses, defining the term spouse as "the husband or wife . . . of a member who, on or before the date of a court order, was married to that member." 10 U.S.C. § 1408(a)(6). So we must apply the *Feeney* test. To satisfy the first element of the test, it is not enough that the statute be facially neutral; rather, there must also be no covert sex-based discrimination. *Feeney*, 442 U.S. at 274. There are, to be sure, isolated statements in the legislative history describing the Act as concerned about service members' wives. *See, e.g.*, S. Rep. No. 97-502, at 43, *reprinted in* 1982 U.S.C.C.A.N. 1596, 1626 (additional statement of Sen. Denton) ("[I]t is virtually impossible to compensate the military *wife* for her efforts caring for husband, family, and home, and in preserving a sense of family stability.") (emphasis added). As the district court recognized, however, these isolated excerpts are inconclusive because the bulk of the congressional materials used sex-neutral terms, speaking of spouses and not wives. *See, e.g.*, S. Rep. No. 97-502, at 6, 1982 U.S.C.C.A.N. at 1601 ("[T]he committee believes that the unique status of the military spouse and that spouse's great contribution to our defense require that the status of the military spouse be acknowledged, supported and protected.").

The second *Feeney* element requires a showing "that a gender-based discriminatory purpose has, at least in some measure, shaped the . . . legislation." *Feeney*, 442 U.S. at 276. The plaintiffs, however, do not and cannot plausibly allege that Congress passed the Act "at

least in part 'because of,' not merely 'in spite of,' its adverse effects" upon female service members, *id.* at 279. Indeed, the plaintiffs complain that Congress did not consider the plight of female service members, which means that Congress cannot have possessed the invidious intent to discriminate against them that would allow us to apply intermediate scrutiny.

The statute therefore does not distinguish between men and women, but between retired service members and their former spouses. We apply rational basis review to this classification. "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (citations omitted). Under the rational basis test a court must determine (1) "whether the purpose that animates [the challenged] laws and regulations is legitimate," *Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel*, 20 F.3d 1311, 1320 (4th Cir. 1994), and (2) whether it was "reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose," *id.* (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668 (1981)).

The Act survives this rational basis review. First, Congress exhibited special concern for the personal and economic sacrifices that the spouse of a military service member makes to sustain the marriage. *See* S. Rep. No. 97-502, at 6, 1982 U.S.C.C.A.N. at 1601 ("Child care and management of the family household are many times solely the spouse's responsibility. The military spouse lends a cohesiveness to the family facing the rigors of military life, including protracted and stressful separations."). To be sure, Congress also demonstrated respect for the rights of service members. *See Mansell*, 490 U.S. at 594 ("[T]he legislative history, read as a whole, indicates that Congress intended both to create new benefits for former spouses and to place limits on state courts designed to protect military retirees."). In any event, Congress could have properly concluded that those sacrifices were even more intense than the ordinary sacrifices associated with marriage to civilian employees, and that former spouses of service members thus deserved additional protection not afforded to for-

mer spouses of civilian employees. While not the sole purpose, former spouse protection was a legitimate purpose animating the Act.

Second, the Act was indeed rationally related to this legitimate government interest. As we have explained, the Act has a limited function. It simply freed state courts to divide upon divorce military retirement pay based on service completed during the marriage, which allowed the state courts to increase the property available to the former spouse. The Act additionally established the payments mechanism that makes it easier for some former spouses to receive their share of retirement pay pursuant to state court orders. For this scheme to work, of course, the Act must distinguish former spouses (who are entitled to take advantage of the payments mechanism) from the retired members (whose retirement pay is subject to distribution). The plaintiffs argue that the Act unconstitutionally favors the former spouses over service members by allowing the former spouses access to retirement pay even though they, unlike the members, are not obligated to continue to perform duties for the government if called upon and are not subject to the military justice provisions. *Supra*, part I.A. This argument presupposes that the retirement pay can only be characterized as compensation for services rendered during retirement. The presupposition is false. Although military retirement pay has some unique features, it also resembles an ordinary civilian pension in many respects, and Congress grasped that resemblance in passing the Act. In particular, the Supreme Court has explained that the Act's "premise behind permitting the States to apply their community property laws to military retirement pay is that such pay is deferred compensation for past services," not "compensation for reduced current services" that the service member performs after retirement. *Barker*, 503 U.S. at 603. Thus, Congress could reasonably permit states to divide military retirement pay in favor of former spouses without making those spouses work for this pay, because the pay compensates the member for past services that the member rendered with the former spouse's familial, emotional, and other support.

The plaintiffs also contend that the Act creates a second classification by treating retired service members less favorably than other former federal employees. One of their concerns is that the Act does not contain a remarriage cutoff, so a former spouse who remarries does not thereby forfeit the right to receive the determined portion of the

service member's retired pay. In contrast, certain payments to former spouses of employees in the civil service, foreign service, and intelligence agency are terminated if those spouses remarry before reaching a specified age. *See, e.g.*, 5 U.S.C. § 8445 (civil service); 22 U.S.C. § 4054 (foreign service); 50 U.S.C. § 2032 (Central Intelligence Agency). After reviewing the Act for Congress, the DOD concluded that the absence of a remarriage cutoff provision requires no legislative correction because the question is best answered in individual cases by state courts. *See* DOD, A Report to Congress Concerning Federal Former Spouse Protection Laws 82 (2001) ("State courts, not Federal law, should determine the effect of remarriage."), *available at* http://www.dod.mil/prhome/spouserev.html (hereinafter Former Spouse Protection Report). The decision whether to include a remarriage cutoff in the statute is properly left to Congress. The Constitution simply does not compel Congress to provide for the service members a system entirely identical to the one created for other government officers. The spouses of service members make unique sacrifices during marriage, foregoing in many cases the opportunity "to pursue . . . career[s]" of their own. S. Rep. No. 97-502, at 6, 1982 U.S.C.C.A.N. at 1601. Recognizing these sacrifices, Congress could reasonably have concluded that a remarriage cutoff was not necessary and that state courts should be free to resolve the question. If one purpose of allowing the former spouse to receive a portion of the military retirement pay is to provide economic support, Congress was not obligated to assume that the need for this support would *always* disappear upon the former spouse's remarriage.

For these reasons, the district court correctly dismissed the equal protection claim.

## IV.

Finally, the plaintiffs challenge the district court's grant of summary judgment in favor of the Secretary on their claim that the Act and its implementing regulations do not provide procedural due process. To evaluate the Act's compliance with the Due Process Clause's procedural component, a court must determine (1) whether the plaintiffs "los[t] something that fits into one of the three protected categories: life, liberty, or property," and (2) whether the plaintiffs "receive[d] the minimum measure of procedural protection warranted

under the circumstances." *Mallette v. Arlington County Employees'
Supp. Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996). The parties do
not dispute that retired service members have a property interest in
their military retirement pay created by federal statutes. *Supra*, part
I.A. They also appear to agree that by allowing certain former spouses
to enforce state court orders dividing the marital estate, the federal
payments mechanism at least contributes to a deprivation of this prop-
erty interest. The parties focus instead on the second part of the proce-
dural due process test. The plaintiffs contend that due process requires
the Secretary to investigate the jurisdictional basis for every state
court divorce decree, instead of accepting as valid all decrees that are
"regular on [their] face." 10 U.S.C. § 1408(b)(2). They also claim that
the Secretary must fully indemnify a retiree for any pay given to the
former spouse based on an invalid divorce decree. The plaintiffs insist
further that the Secretary must review whether the state court com-
plied with the terms of the Servicemembers Civil Relief Act, 50
U.S.C. app. § 501 *et seq.*, rather than taking as true the state court's
certification that it has complied with this statute. In the plaintiffs'
view, moreover, due process requires pre- and post-deprivation reme-
dies and procedures more formal than the "informal, ex parte, and
incomplete" reconsideration provision set forth in DOD 7000.14-R
¶ 2912. Appellants' Br. at 44.

In *Endicott-Johnson Corp. v. Encyclopedia Press, Inc.*, 266 U.S.
285 (1924), the Court upheld a state law that allowed a creditor with
a valid state court judgment to garnish the debtor's wages without
additional notice. The Court reasoned that the pre-deprivation pro-
ceeding was sufficient to put the debtor on notice that his property
could be subject to the creditor's claim. *Id.* at 288-89. It held that "in
the absence of a statutory requirement, it is not essential that [the
judgment debtor] be given notice before the issuance of an execution
against his tangible property." *Id.* at 288. The Secretary contends that
*Endicott* forecloses the plaintiff's procedural due process attack
because the state court divorce proceedings give members all the
notice that they are due. Although *Endicott* has not been overruled,
it was decided before the Court significantly revised its approach to
due process rights, and since then courts have been reluctant to give
*Endicott* controlling weight. *See Aacen v. San Juan County Sheriff's
Dep't*, 944 F.2d 691, 695 & n.5 (10th Cir. 1991) (explaining that
*Endicott* focused on "*pre*-execution notice of seizure and hearing" and

that various courts "have questioned the precedential value of *Endicott* in light of modern due process decisions."); *see also* Diana Gribbon Motz & Andrew H. Baida, *The Due Process Rights of Postjudgment Debtors and Child Support Obligors*, 45 Md. L. Rev. 61, 64-69 (1986) (noting judicial hesitation in relying on *Endicott* in the aftermath of procedural due process cases such as *Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969)). Instead of relying on *Endicott*, the district court went on to examine the Act and the regulations using the balancing test first articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and found that the payments mechanism satisfied this test.

We need not decide whether the plaintiffs' claim is properly assessed through a direct application of *Endicott* or through the *Mathews* balancing test, because in the end they show the same thing: the Act and the regulations provide all that due process requires. *Endicott* suggests that service members who dispute the state court's allocation of retired pay to their former spouses must present their legal or factual arguments to the state courts, not save these arguments to raise them later before DFAS. *Mathews* requires attention to three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including . . . the fiscal and administrative burdens that the additional . . . procedural requirement would entail.

424 U.S. at 335. Here, the "private interest that will be affected by the official action," *id.*, is the service member's federal statutory right to retirement pay. As we have already explained, the Act qualifies that right by empowering state courts to award to the former spouse up to 50 percent of the pay as marital estate property. Retirement pay is a significant asset, so the private interest is not trivial, but neither is it so weighty as to eclipse the other factors.

The next concern is the risk of error. In enforcing state court orders, DFAS might err in several ways. For example, DFAS might

accept a state court order as regular on its face and make payments accordingly even though there is some hidden jurisdictional, procedural, or substantive defect in that order. The plaintiffs offer no evidence that DFAS makes an unacceptably high number of errors under the existing scheme; indeed, they present no evidence concerning the error rate at all. The plaintiffs also present no evidence that DFAS commonly overpays former spouses, based on its own errors or on those of state courts, and then fails to compensate service members for the resulting loss. The only relevant evidence in the record was to the contrary: a DFAS employee testified that if a former spouse is overpaid because of a DFAS error, once DFAS learns of the error it reduces future payments to that former spouse until the effect of the overpayment is canceled out. The agency's lack of a written regulation governing this process is not relevant.

Without empirical evidence that the payments mechanism does not work *in practice*, we can only consider the risk of error in the mechanism *as described* in the statutes and regulations themselves, and we conclude that the risk is minimal. To begin with, we have no basis for assuming that state courts routinely favor former spouses over service members in dividing military retirement pay. Any mistakes state courts do make seem likely to be caught by DFAS personnel who, following the regulations, scan the certified state court orders presented for facial compliance with jurisdictional and procedural safeguards for service members. *See* DOD 7000.14-R ¶ 2906. And when that process fails, aggrieved members may request DFAS reconsideration of the decision. *Id.* ¶ 2912.

The plaintiffs speculate that if DFAS were to go beyond the face of the state court orders to assess their validity, DFAS would catch even more state court errors. They do not specify exactly what additional investigation they believe DFAS personnel must conduct to comply with due process, though they hint that DFAS must provide written explanations for individual garnishment decisions as well as create a channel for appellate review of those explanations. Requiring the addition of any procedures would bear on the government's interest in the *Mathews* balancing. More intensive review would slow payments processing. DFAS sends monthly retirement pay distributions to about 54,000 former spouses, *see* Former Spouse Protection Report, *supra* part III.C., at 19 (providing figures as of April 1, 1999),

and all of them might have to wait longer to get their share of retirement pay if DFAS employees must review in finer detail the underlying merits of state court divorce orders. If DFAS did not want to increase case-processing time, it would have to hire additional staff, which would raise the government's total expenses for running the payments mechanism.

We conclude that requiring DFAS to conduct additional review before complying with state court orders would harm the government's interest in minimizing administrative expenses without demonstrably reducing the error rate of the existing enforcement system. Due process does not require more than DFAS already provides pursuant to the Act. The district therefore correctly granted summary judgment to the Secretary on the procedural due process claim.

## V.

For all of these reasons, we uphold the statute and affirm the district court orders of dismissal and summary judgment.

*AFFIRMED*

WIDENER, Circuit Judge, concurring:

I concur in the result. I write separately, however, because I am of opinion that the district court correctly determined that it lacked subject matter jurisdiction under the *Rooker-Feldman* doctrine.

*Exxon Mobil* reaffirmed that the doctrine

> is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.

*Exxon Mobil Corp.*, 544 U.S. at 284.

That is precisely the case we have here. The plaintiffs are inviting district court review of their individual state court judgments when they ask the federal court to declare the Act unconstitutional. These plaintiffs are "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." *Exxon Mobil Corp.*, 544 U.S. at 284. Declaring the Act unconstitutional would certainly upset those judgments for payments ordered by the state court decisions would cease. Such an outcome in federal court likens this case to "the kind from which the doctrine acquired its name." *Exxon Mobil Corp.*, 544 U.S. at 284.

Thus, I would affirm the judgment of the district court but on its reasoning: that the *Rooker-Feldman* doctrine divested it of subject matter jurisdiction.