**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-3189

GREAT WESTERN MINING &
MINERAL COMPANY,
Assignee of HRC/NJ, Inc., Assignee of Active Entertainment
Inc.,

Appellant

v.

FOX ROTHSCHILD LLP;
THOMAS D. PARADISE, Esq., Partner, Fox Rothschild
LLP;
ROBERT S. TINTNER, Esq., Partner, Fox Rothschild LLP;
ADR OPTIONS, INC.;
THOMAS B. RUTTER, Esq., CEO, ADR Options

On Appeal from the District Court
for the District of New Jersey
(No. 08-cv-1093)
District Judge:  Honorable William H. Walls

Argued March 25, 2010

Before: McKEE, *Chief Judge*, and FUENTES and
CHAGARES, *Circuit Judges*

(Opinion Filed:  August 5, 2010)

Benjamin C. Weiner, Esq.  **(ARGUED)**
19 Countryside Drive
Livingston, NJ 07039

*Counsel for Appellant*

Thomas A. Cuniff, Esq.**(ARGUED)**
Fox Rothschild LLP
997 Lenox Drive
Building Three
Lawrenceville, NJ 08648

*Counsel for Appellees*

OPINION OF THE COURT

FUENTES, *Circuit Judge*:

Having lost in state court, Great Western Mining &

Mineral Company ("Great Western") brought a civil rights action in federal court under 42 U.S.C. § 1983. Great Western alleges that its state-court losses were the result of a "corrupt conspiracy" between the named defendants and certain members of the Pennsylvania state judiciary to exchange favorable rulings for future employment as arbitrators with ADR Options, Inc. ("ADR Options"), an alternative dispute resolution entity. The District Court dismissed Great Western's complaint for failure to state a claim and denied its motion for reconsideration and motions for leave to amend its complaint.

As a threshold matter, we address Defendants' contention that the *Rooker-Feldman* doctrine precludes the exercise of subject matter jurisdiction over this action. We disagree, as Great Western is not "complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Rather, Great Western asserts an independent constitutional claim that the alleged conspiracy violated its right to be heard in an impartial forum. Turning to the merits, we conclude that granting Great Western leave to amend would have proved futile as even the final version of its complaint failed to plead facts plausibly suggesting a conspiratorial agreement. Accordingly, we will affirm.

**I.**

This case originates out of a dispute involving a miniature golf course in which Active Entertainment, Inc.

("Active") was the losing party.[1]  Active retained Brownstein & Vitale, P.C. ("B&V") to represent it in litigation against an entity that Active had hired to build a miniature golf course. Dissatisfied with the damages awarded in that litigation, Active brought a malpractice suit against its counsel, Gary Brownstein, Marc D. Vitale, and B&V.  All parties agreed to binding arbitration before Thomas Rutter and Rutter's company, ADR Options.  James F. Wiley, III, represented Active; Thomas Paradise, a partner at Fox Rothschild LLP ("Fox Rothschild"), represented Vitale.

According to the Complaint, ADR Options is the largest provider of alternative dispute resolution ("ADR") services in Pennsylvania, New Jersey, and Delaware. Rutter is the founding shareholder and Chief Executive Officer of ADR Options. Many of ADR Options's arbitrators are former federal and state judges.

Before beginning arbitration proceedings, the parties entered into a binding ADR Options Arbitration Agreement, which provided that:

> Each party and participating attorney has disclosed any past or present relationship with the arbitrator, direct or indirect, whether financial,

---

[1] These facts are taken from the allegations made in the Complaint, which, on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true and view in the light most favorable to the plaintiff. *Umland v. PLANCO Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

> professional, social or any other kind. The arbitrator has also disclosed any past or present relationship with any party or attorney. It is understood that any doubt has been resolved in favor of disclosure.

(J.A. at 114 [Proposed Am. Compl. 3, ¶ 14].) The result of the arbitration proceedings was an award for defendants Brownstein, Vitale, and B&V. Thereafter, Great Western became the assignee of Active's interest.

Great Western filed a petition in Pennsylvania state court to vacate the arbitration award on the ground of improper failure to disclose potential conflicts. In particular, Great Western alleged that the managing partner at Fox Rothschild, Louis Fryman, was concurrently employed at ADR Options as an arbitrator and that Paradise maintained a professional relationship with Rutter.[2] The Philadelphia Court of Common Pleas and the Superior Court of Pennsylvania ruled against Great Western and confirmed the arbitration award. The Supreme Court of Pennsylvania denied Great Western's petition for allowance of appeal.

---

[2] In its federal Complaint, Great Western further alleged that Vitale was an attorney for ADR Options and Rutter. (J.A. at 124 [Proposed Am. Compl. 3, ¶ 82].) Great Western acknowledged, however, that it did not discover this information until after the state-court litigation. (Great Western Br. 7.) As such, this allegation was not included in Great Western's petition to vacate the arbitration award.

While its appeal was pending before the Superior Court of Pennsylvania, Great Western filed a separate civil action in the Philadelphia Court of Common Pleas against Rutter, ADR Options, Fox Rothschild, and Paradise, raising contract and tort claims and alleging a failure to disclose the purportedly improper relationships. Robert Tintner, a partner at Fox Rothschild, represented all of the defendants. The Court of Common Pleas dismissed the action as collaterally estopped, and Great Western appealed. According to Great Western's counsel, Wiley, shortly thereafter Tintner called Wiley and informed him that "[t]here [was] no way that a Philadelphia court [was] ever going to find against Thomas Rutter given his relationship with the Philadelphia court system." (J.A. at 118 [Proposed Am. Compl. 3, ¶ 43].) The Superior Court of Pennsylvania affirmed the decision of the Court of Common Pleas dismissing the action, and the Supreme Court of Pennsylvania denied Great Western's petition for allowance of appeal.

Thereafter, Great Western filed a federal action under 42 U.S.C. § 1983, claiming deprivations of procedural and substantive due process. As defendants, Great Western named Fox Rothschild, Paradise, Tintner, ADR Options, and Rutter (collectively, "Defendants"). Great Western alleged that the Pennsylvania state-court decisions were corrupted by the improper influence of Defendants, arising both from the Pennsylvania courts' reliance on Rutter's services and from Pennsylvania judges' prospect of future employment with ADR Options. Specifically, Great Western claimed that "Defendants had the power yet failed to take action to prevent violation of Great Western's constitutional rights to due process." (J.A. at 127 [Proposed Am. Compl. 3, ¶ 105]). The District Court

-6-

granted Defendants' motion to dismiss for failure to state a claim, holding that Great Western had not sufficiently alleged that Defendants acted under color of state law. The District Court reasoned that the corruption alleged by Great Western "exists only to the extent that defendants conspired with the courts to ensure the outcome of the underlying case" and concluded that Great Western had failed to properly allege the existence of a conspiracy between Defendants and the Pennsylvania state court system. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, No. 08-cv-1093, 2009 WL 704335, at *4 (D.N.J. Mar. 16, 2009).

Thereafter, Great Western filed a motion for reconsideration and for leave to amend its complaint pursuant to Federal Rules of Civil Procedure 59(e) and 15(a), attaching a draft amended complaint ("Proposed Amended Complaint 1"). While the reconsideration motion was pending, Great Western filed a second motion for leave to amend, seeking to substitute a new proposed draft amended complaint ("Proposed Amended Complaint 2"), which was attached. Several weeks later and without a ruling on the first two motions to amend, Great Western filed a third motion for leave to amend, seeking to substitute yet another proposed draft amended complaint ("Proposed Amended Complaint 3"), which was attached. In this motion, Great Western argued that it had newly discovered evidence, specifically Rutter's May 14, 2009 admission under oath in another lawsuit that some of the judges who had ruled against Great Western and for ADR Options had already approached Rutter regarding the prospect of employment upon leaving the bench.

On June 24, 2009, the District Court issued an unpublished Letter Order denying the motion for reconsideration on the merits and denying the three motions for leave to amend as moot. In ruling on the motion for reconsideration, the District Court considered Proposed Amended Complaint 2, but *not* Proposed Amended Complaint 3. In a footnote, the District Court explained that it declined to consider Proposed Amended Complaint 3 because "[t]o allow plaintiff to repeatedly submit drafts of its complaint while plaintiff's original motions are still pending would be prejudicial to defendants." (J.A. at 3.) The District Court denied the motion for reconsideration, holding that the allegations in Proposed Amended Complaint 2 did not support a conspiracy claim. On appeal, Great Western challenges the District Court's refusal to consider Proposed Amended Complaint 3 and argues that the motion for reconsideration was erroneously denied.

**II.**

Defendants contest our jurisdiction and that of the District Court, contending that this action is barred by the *Rooker-Feldman* doctrine. Although Defendants raised this argument in their motion to dismiss, the District Court declined to address it and, exercising jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, dismissed Great Western's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). We exercise de novo review over questions of subject matter jurisdiction.[3] *PennMont Secs. v. Frucher*, 586 F.3d 242,

--------

[3] To the extent that we have subject matter jurisdiction, we exercise it under 28 U.S.C. § 1291.

-8-

245 (3d Cir. 2009).  Moreover, all courts "have an independent obligation to determine whether subject-matter jurisdiction exists."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

Our standard of review of a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is plenary. *PennMont Secs.*, 586 F.3d at 245.  We review a district court decision refusing leave to amend under Federal Rule of Civil Procedure 15(a) for abuse of discretion.  *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).  Likewise, the denial of a motion for reconsideration is reviewed for abuse of discretion.  *McDowell v. Phila. Hous. Auth.*, 423 F.3d 233, 238 (3d Cir. 2005).

## III.

### A.  *Rooker-Feldman* Doctrine

In certain circumstances, where a federal suit follows a state suit, the *Rooker-Feldman* doctrine prohibits the district court from exercising jurisdiction.  The doctrine takes its name from the only two cases in which the Supreme Court has applied it to defeat federal subject-matter jurisdiction:  *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  In a recent decision, the Supreme Court held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284.  Thus, any discussion of the

scope of the doctrine must begin with an examination of its namesake cases.

The Supreme Court characterized the lawsuit at issue in *Rooker* as an attempt "to have a judgment of a circuit court in Indiana, which was affirmed by the Supreme Court of the state, declared null and void, and to obtain other relief dependent on that outcome." 263 U.S. at 414. Rooker and others, who had lost in state court, sought relief in federal district court, arguing that the state-court judgment was "in contravention of" the United States Constitution. *Id.* at 415. The Supreme Court affirmed the dismissal by the district court for lack of jurisdiction. The Court reasoned that:

> [u]nder the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the judgment for errors of that character. To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the District Courts is strictly original.

*Id.* at 416 (internal citations omitted). In other words, the relief sought by the plaintiffs in federal court required federal appellate review of the state-court judgment, a task entrusted by statute solely to the Supreme Court.

Sixty years later, the Supreme Court revisited the issue in *Feldman*. The plaintiffs in *Feldman* had petitioned the District of Columbia Court of Appeals (the equivalent of a state's highest court, *see* 28 U.S.C. § 1257(b)) for waiver of a court rule that required applicants to the District of Columbia bar to have graduated from an accredited law school. *Feldman*, 460 U.S. at 463. The court denied their requests for a waiver, and the plaintiffs filed a suit in federal district court, challenging the D.C. court's refusal to waive the rule and admit them to the bar or at least permit them to take the bar

-10-

examination. *See id.* at 468–70, 472–73. The Supreme Court, affirming the Court of Appeals, reemphasized that "a United States District Court has no authority to review final judgments of a state court in judicial proceedings." *Id.* at 482. Thus, insofar as the plaintiffs sought review of the D.C. court's judgments, the district court lacked subject matter jurisdiction. *Id.* at 482. To the extent, however, that the plaintiffs challenged the constitutionality of the bar admission rules themselves, their suit was not barred as it did not "require review of a final state judgment in a particular case." *Id.* at 486.

Twice in *Feldman*, the Supreme Court used the term "inextricably intertwined" to describe the type of claims that plaintiffs may not raise in federal district court. First, the Court addressed the argument that if a plaintiff declined to assert certain constitutional arguments in state court, a federal district court could exercise jurisdiction over those claims as it would not be reviewing an issue decided by the state court. *Id.* at 482 n.16. The Court rejected this line of reasoning, stating that:

> [i]f the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar, then the District Court is in essence being called upon to review the state court decision. This the District Court may not do.

*Id.* In the second instance, the Court employed the term to distinguish between the plaintiffs' challenge to the constitutionality of the bar rules themselves, which could proceed in federal district court, and their challenge to the denial of the waiver requests, which was prohibited:

> [I]t is clear that [the plaintiffs'] allegations that the District of Columbia Court of Appeals acted

-11-

arbitrarily and capriciously in denying their petitions for waiver . . . required the [United States] District Court to review a final judicial decision of the highest court of a jurisdiction in a particular case. These allegations are inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny [the plaintiffs'] petitions. The [United States] District Court, therefore, does not have jurisdiction over these elements of the [plaintiffs'] complaints.

*Id.* at 486–87. In other words, any of the plaintiffs' claims contesting the denial of their waivers, even if not raised before the District of Columbia court, were "inextricably intertwined" with judicial decisions by the District of Columbia court and, thus, were barred.

*Rooker* and *Feldman* established the principle that federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments, but they offered little instruction on how to apply that principle. Subsequent Supreme Court case law provided little further assistance. Before *Exxon Mobil*, "[t]he few decisions that have mentioned *Rooker* and *Feldman* have done so only in passing or to explain why those cases did not dictate dismissal." *Exxon Mobil*, 544 U.S. at 287. In *Exxon Mobil*, the Court "granted certiorari to resolve conflict among the Courts of Appeals over the scope of the *Rooker-Feldman* doctrine." *Id.* at 291 (internal citation omitted). At the outset, the Court noted that the doctrine, as variously interpreted in the lower courts, "has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts, and superseding the ordinary application of preclusion law." *Id.* at 283. The Court found just such an error in the

-12-

decision on review, in which we had held that "[o]nce ExxonMobil's claims had been litigated to a judgment in state court . . . *Rooker-Feldman* 'preclude[d] [the] federal district court from proceeding.'" *Id.* at 290–91 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 364 F.3d 102, 104 (3d Cir. 2004)) (alterations in original). We had "rejected ExxonMobil's argument that *Rooker-Feldman* could not apply because ExxonMobil filed its federal complaint well before the state-court judgment." *Id.* at 290. Rather, we had concluded that we lacked jurisdiction because ExxonMobil was "endeavoring in the federal action to 'invalidate' the state-court judgment, 'the very situation,' . . . 'contemplated by *Rooker-Feldman*'s "inextricably intertwined" bar.'" *Id.* at 291 (quoting *Exxon Mobil*, 364 F.3d at 106).

Rejecting such an expansive application of the *Rooker-Feldman* doctrine, the Court held that it is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil*, 544 U.S. at 284. The Court emphasized that "*Rooker* and *Feldman* exhibit the *limited circumstances* in which this Court's appellate jurisdiction over state-court judgments precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority." *Id.* at 291 (emphasis added) (internal citation omitted). The Court also clearly distinguished the *Rooker-Feldman* doctrine from preclusion, stating that "properly invoked concurrent jurisdiction [does not] vanish[] if a state court reaches judgment on the same or related question while the case remains *sub judice* in a federal court." *Id.* at 292. "When there is parallel state and federal litigation, *Rooker-Feldman* is not triggered simply by the entry of judgment in state court." *Id.* But the "[d]isposition of the

federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Id.* at 293. Finally, the Court explained that *Rooker-Feldman* is not implicated "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* If the matter was previously litigated, as long as the "federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" *Id.* (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)) (further citation omitted).

Breaking down the holding of *Exxon Mobil*, we conclude that there are four requirements that must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. *Exxon Mobil*, 544 U.S. at 284. The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim.

The second requirement—that a plaintiff must be complaining of injuries caused by a state-court judgment—may also be thought of as an inquiry into the source of the plaintiff's injury. *See Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006) ("Here, the district court erred by applying the *Rooker-Feldman* doctrine 'beyond the contours of the *Rooker* and *Feldman* cases,' because Turner's action in the district court did not complain of injuries 'caused by the state court judgment.'" (quoting *Exxon Mobil*, 544 U.S. at 283–84)). But what does it mean for a plaintiff to be complaining of an injury caused by the state-court judgment itself? A look at a few representative cases and examples helps

-14-

to illuminate this concept.  In *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 87 (2d Cir. 2005), the court posited the following example of a case that would be barred by *Rooker-Feldman* because the state-court judgment itself was the source of the injury:

> Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son.  If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal.

To the contrary, when the source of the injury is the defendant's actions (and not the state court judgments), the federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by the state court:

> Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses.  If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment.  Instead, he will be alleging *injury based on the employer's discrimination*.  The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker-Feldman*, of the state-court judgment.

*Id.* at 87–88 (emphasis added).

-15-

The critical task is thus to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury "produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." *Id.* at 88. In *Hoblock*, after first noting that the "voters' claims in this case seem at first to complain only of the [Board of Elections'] refusal to tally their votes rather than of any injury caused by the state court's judgment," the court clarified that "in refusing to tally the votes, the Board [was] acting under compulsion of a state-court order." *Id.* Specifically, the Board, "had it been left to its own devices, would have counted the 40 absentee ballots," but it was ordered not to do so by the state court. *Id.* at 89. Thus, "the state-court judgment produced the Board's refusal to count the ballots, the very injury of which the voters complain." *Id.*

When, however, a federal plaintiff asserts injury caused by the defendant's actions and not by the state-court judgment, *Rooker-Feldman* is not a bar to federal jurisdiction. *See, e.g.*, *Coles v. Granville*, 448 F.3d 853, 859 (6th Cir. 2006); *Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 719 (4th Cir. 2006). A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been "caused by" those proceedings. *See McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007); *Turner*, 449 F.3d at 547.

Although this test is seemingly straightforward, application becomes more complicated when a federal plaintiff complains of an injury that is in some fashion related to a state-court proceeding. For example, in *McCormick v. Braverman*, 451 F.3d 382, 384 (6th Cir. 2006), the plaintiff filed suit in federal court contending that she was the owner of certain real property and that the defendants illegally interfered with her ownership. More specifically, the plaintiff alleged that the defendants engaged in fraud and misrepresentation in state-

-16-

court divorce proceedings involving the real property at issue. *Id.* at 388. Assessing the plaintiff's allegations, the court held that while some were barred by the *Rooker-Feldman* doctrine, the remainder were "independent" claims over which the federal courts had jurisdiction. The non-barred claims were as follows: (1) the defendants committed fraud and misrepresentation in the divorce proceedings; (2) the defendants intentionally did not make the plaintiff a party to the litigation concerning the order of receivership over the real property; and (3) the defendants committed an abuse of process in the divorce proceedings. *Id.* at 392. Focusing on the source of the alleged injuries, the court held that "[n]one of these claims assert an injury caused by the state court judgments . . . . Instead, Plaintiff asserts *independent claims* that those state court judgments were procured by certain Defendants through fraud, misrepresentation, or other improper means . . . ." *Id.* Even though the injuries of which the plaintiff complained helped to cause the adverse state judgments, these claims were "independent" because they stemmed from "some other source of injury, such as a third party's actions." *Id.* at 393. On the other hand, the court explained that the plaintiff's claim that the state court's "order of receivership in and of itself is illegal and causes Plaintiff harm" sought review of that order and thus was not independent and was barred by *Rooker-Feldman*. *Id.* at 395.

In *Fieger v. Ferry*, 471 F.3d 637, 639 (6th Cir. 2006), an attorney filed a suit in federal court challenging both the refusal of certain Michigan Supreme Court justices to recuse themselves from cases in which he was involved and the constitutionality of Michigan's recusal rule. In light of the "acrimonious and well-publicized dialogue between Fieger . . . and several justices of the Michigan Supreme Court," Fieger sought recusal of four of the justices, but the Justices denied the recusal motions. *Id.* at 639–40 (internal quotation marks omitted). In federal court, Fieger alleged that this failure to

-17-

recuse violated his constitutional rights and sought a declaratory judgment to this effect. The court held that this claim required review and rejection of the "Justices' past recusal decisions," which were rendered before the federal proceedings, and thus was barred by *Rooker-Feldman*. *Id.* at 644. With respect to Fieger's challenge to Michigan's recusal rule, however, the court held that it was not barred, as "the source of Fieger's alleged injury is not the . . . state court judgments; it is the purported unconstitutionality of Michigan's recusal rule as applied in future cases. Such a claim is independent of the past state court judgments." *Id.* at 646.

As is clear from the preceding discussion, the two key requirements—that the injury must be caused by the state-court judgment and that the plaintiff must invite review and rejection of that judgment—are closely related. Yet, a federal plaintiff who was injured by a state-court judgment is not invariably seeking review and rejection of that judgment. For example, in *Adkins v. Rumsfeld*, 464 F.3d 456, 460 (4th Cir. 2006), current and retired service members whose retirement pay was divided in state divorce proceedings pursuant to the Uniformed Services Former Spouses' Protection Act brought an action in federal court challenging the statute's constitutionality. The court held that "even if these plaintiffs were 'state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced,' . . . they were *not* 'inviting district court review and rejection of those judgments.'" *Id.* at 464 (quoting *Exxon Mobil*, 544 U.S. at 284). A declaration that the federal statute was unconstitutional as applied would prevent the continued transmission of payments to the plaintiffs' former spouses. *Id.* "Such a declaration would not, however, amount to appellate reversal or modification of a valid state court decree entered in an individual plaintiff's divorce case. At bottom, an examination of the federal constitutional challenge presented here against the [statute] does not require scrutinizing and

invalidating any individual state court judgment." *Id.* As such, the plaintiffs' federal suit did not require the prohibited exercise of appellate jurisdiction by the district court. *Id.*

What this requirement targets is whether the plaintiff's claims will require appellate review of state-court decisions by the district court. Prohibited appellate review "consists of a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law." *Bolden v. City of Topeka, Ks.*, 441 F.3d 1129, 1143 (10th Cir. 2006). It is important to distinguish such appellate review from those cases in which "a party attempts to litigate in federal court a matter previously litigated in state court," *Exxon Mobil*, 544 U.S. at 293, or in which "the federal plaintiff and the adverse party are simultaneously litigating the same or a similar dispute in state court," *Noel v. Hall*, 341 F.3d 1148, 1163 (9th Cir. 2003) (cited with approval in *Exxon Mobil*). If the matter was previously litigated, there is jurisdiction as long as the "federal plaintiff present[s] some independent claim," even if that claim denies a legal conclusion reached by the state court. *Exxon Mobil*, 544 U.S. at 293 (internal quotation marks & citation omitted; alteration in original). When "the second court tries a matter anew and reaches a conclusion contrary to a judgment by the first court, without concerning itself with the bona fides of the prior judgment," the second, or federal, court "is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment." *Bolden*, 441 F.3d at 1143. In the case of simultaneous litigation, both suits may proceed under the well-established rule allowing parallel state and federal litigation. *Noel*, 341 F.3d at 1163. In neither of these situations, unlike in a suit seeking review of a state-court judgment, "does *Rooker-Feldman* bar subject matter jurisdiction in federal district court, for in neither situation is the federal plaintiff complaining of legal injury caused by a state court judgment because of a legal error committed by the state

-19-

court." *Id.* at 1164. Instead, "in both situations, the plaintiff is complaining of legal injury caused by the adverse party." *Id.*

In a case subsequent to *Exxon Mobil*, the Supreme Court again emphasized that *Rooker-Feldman* is a "narrow doctrine" that "applies only in limited circumstances." *Lance v. Dennis*, 546 U.S. 459, 464–66 (2006) (internal quotation marks & citations omitted). In light of this admonition, we have recognized that "caution is now appropriate in relying on our pre-*Exxon* formulation of the *Rooker-Feldman* doctrine," which focused on whether the state and federal suits were "inextricably intertwined." *Gary v. Braddock Cemetery*, 517 F.3d 195, 200 n.5 (3d Cir. 2008). In *Exxon Mobil*, the phrase "inextricably intertwined" appears only three times, twice in the Court's description of *Feldman* and once in the Court's discussion of the lower court's decision. 544 U.S. at 286 & n.1, 291. The Court deliberately did not rely on this formulation in its jurisdictional analysis, instead employing the four-part inquiry that we have outlined above. *See McCormick*, 451 F.3d at 394 ("In *Exxon*, the Supreme Court implicitly repudiated the circuits' post-*Feldman* use of the phrase 'inextricably intertwined' to extend *Rooker-Feldman* to situations where the source of the injury was not the state court judgment."). Although the term "inextricably intertwined" was used twice by the Supreme Court in *Feldman*, reliance on this term has caused lower federal courts to apply *Rooker-Feldman* too broadly. The phrase "inextricably intertwined" does not create an additional legal test or expand the scope of *Rooker-Feldman* beyond challenges to state-court judgments. When a federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is "inextricably intertwined" with the state judgment. *See McCormick*, 451 F.3d at 394–95; *Davani*, 434 F.3d at 719; *Hoblock*, 422 F.3d at 86; *see also Bolden*, 441 F.3d at 1141 ("[T]he purpose of the term is to highlight that a challenge to a judgment is barred even

-20-

if the claim forming the basis of the challenge was not raised in the state proceedings."). The phrase "inextricably intertwined," however, "has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil*."[4]  *Hoblock*, 422 F.3d at 87.

---

[4] Defendants cite to cases in which, post-*Exxon Mobil*, we relied on our pre-*Exxon Mobil* formulation of the *Rooker-Feldman* doctrine, specifically the "inextricably intertwined" test. Although we cited our pre-*Exxon Mobil* definition of "inextricably intertwined," at bottom, the holdings in these cases rested on the same concerns at issue in *Exxon Mobil*—whether the plaintiff's claim complains of an injury caused by a state-court judgment rendered before the federal proceeding and seeks review and rejection of that judgment. Specifically, in *Taliaferro v. Darby Township Zoning Board*, 458 F.3d 181, 193 (3d Cir. 2006), we held that there was federal subject matter jurisdiction as the federal action "was commenced . . . well before any state court judgment was reached, so the district court could not have been invited to review and reject such a judgment."

In two other cases, we held that the *Rooker-Feldman* doctrine barred the suit because a favorable decision in federal court would require negating or reversing the state-court decision. *In re Madera*, 586 F.3d 228, 232 (3d Cir. 2009); *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005). As such, we described the state and federal suits as "inextricably intertwined," using this phrase as a shorthand for the concept that the plaintiff could not "prevail on her federal claim without obtaining an order that would negate the state court[s'] judgment[s]." *In re Knapper*, 407 F.3d at 581 (internal quotation marks & citation omitted; alterations in original).

Accordingly, all three of these cases are consistent with *Exxon Mobil* and with the approach we adopt today. Nevertheless, for the sake of clarity, we should exercise

-21-

As a final step, should the *Rooker-Feldman* doctrine not apply such that the district court has jurisdiction, "[d]isposition of the federal action, once the state-court adjudication is complete, would be governed by preclusion law." *Exxon Mobil*, 544 U.S. at 293. In other words, the federal court must "'give the same preclusive effect to a state-court judgment as another court of that State would give.'" *Id.* (quoting *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986)) (further citation omitted). As *Exxon Mobil* makes clear, the *Rooker-Feldman* inquiry is distinct from the question of whether claim preclusion (res judicata) or issue preclusion (collateral estoppel) defeats the federal suit. Importantly, preclusion is not jurisdictional. *Id.* "In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court." *Id.*

Turning to the instant case, the critical question is whether Great Western is a "state-court loser[] complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284. Clearly, Great Western lost in state court, and the state-court judgments were rendered before Great Western commenced its federal suit. The remaining requirements, however, present closer questions. Great Western alleges an extensive conspiracy among Rutter, numerous attorneys, and various state-court judges to engineer Great Western's defeat in state court. It claims that, pursuant to this conspiracy, "the court decisions were predetermined prior

---

"caution . . . in relying on our pre-*Exxon* formulation of the *Rooker-Feldman* doctrine," particularly those cases which may be read to suggest that the phrase "inextricably intertwined" created an additional legal test. *Gary*, 517 F.3d at 200 n.5.

to the beginning of the hearing." (J.A. at 126 [Proposed Am. Compl. 3, ¶ 93].) As a result, Great Western was purportedly forced to litigate in a rigged system and could not "receive a fair hearing in Pennsylvania against ADR Options and Rutter," in violation of its constitutional rights. (*Id.* [Proposed Am. Compl. 3, ¶ 94].) Does such a claim assert injury caused by state-court judgments and seek review and rejection of those judgments? We think not.

Grappling with similar claims, in two cases the Seventh Circuit has held that *Rooker-Feldman* did not operate to bar the federal proceedings. In *Nesses v. Shepard*, 68 F.3d 1003, 1004 (7th Cir. 1995), the federal plaintiff alleged that his losses in state court were the product of a conspiracy among the judges and the lawyers. The court acknowledged that Nesses "was in a sense attacking the ruling by the state court that he had been inexcusably dilatory in complying with a discovery order; he was in the same sense attacking the decisions themselves that dismissed his suit." *Id.* Another aspect of Nesses's suit could also be viewed as an attack on the state-court judgments:

> Nesses cannot show injury from the alleged conspiracy unless the decision dismissing his suit for breach of contract was erroneous.[5] For

---

[5] Note that even if the state-court decision was justified, a plaintiff could nevertheless be entitled to some relief based on the violation of his or her due process rights, which is an independent injury. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978). The Supreme Court has held that plaintiffs who are denied due process can recover mental or emotional distress damages or nominal damages. *Id.* at 262–64, 266 ("Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the

-23-

> suppose that although there was this nefarious conspiracy his suit had no merit and so would have failed even if there had been no conspiracy. Then the conspiracy did him no harm and without harm there is no tort . . . . To show harm and thus keep the present suit alive, Nesses would have to show that the decision by the Indiana court in his suit for breach of contract was erroneous, and that, it may appear, *Rooker-Feldman* bars him from doing.

*Id.* at 1005 (internal citations omitted). But the *Rooker-Feldman* doctrine, the court concluded, "is not that broad." *Id.* Nesses was not merely claiming that the decision of the state court was incorrect or that the decision itself violated his constitutional rights; such claims would be barred. Instead, because Nesses alleged that "*people involved in the decision violated some independent right of his*, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he [could], without being blocked by the *Rooker-Feldman* doctrine, sue to vindicate that right." *Id.* (emphasis added). Moreover, Nesses could, "as part of his claim for damages," show "that the violation caused the decision to be adverse to him and thus did him harm." *Id.* If *Rooker-Feldman* barred jurisdiction, "there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Id.*

In *Brokaw v. Weaver*, 305 F.3d 660, 662 (7th Cir. 2002), the plaintiff alleged that her relatives and officials conspired to cause the state to forcibly remove her from her parents' home.

---

denial of procedural due process should be actionable for nominal damages without proof of actual injury." (internal citations omitted)).

She contended that "the defendants conspired—prior to any judicial involvement—to cause false child neglect proceedings to be filed, resulting in her removal from her home in violation of her . . . substantive and procedural due process rights" and explained "that she [wa]s seeking damages for the conspiracy, not for the state court's decision in the child neglect proceeding." *Id.* at 665. The court held that *Nesses* applied as the plaintiff was "alleging that the people involved in the decision to forcibly remove her from her home and her parents . . . violated her constitutional rights, independently of the state court decision." *Id.* Even if the plaintiff would not have suffered any damages from the alleged conspiracy absent the state-court order, her claim was not barred by *Rooker-Feldman* "because her claim for damages is based on an alleged independent violation of her constitutional rights. It was this separate constitutional violation which caused the adverse state court decision." *Id.* at 667; *see also Ernst v. Child & Youth Servs.*, 108 F.3d 486, 491–92 (3d Cir. 1997) (holding that a claim alleging that defendants violated plaintiff's due process rights by making biased recommendations to the state court, resulting in an improper ruling, was not barred by *Rooker-Feldman* as it was separate from the state-court judgment).[6]

---

[6] In holding that the *Rooker-Feldman* doctrine did not apply, both *Brokaw* and *Ernst* also relied on an alternative ground—that the plaintiff did not have an opportunity to present the current constitutional claims in state court. *Brokaw*, 305 F.3d at 668; *Ernst*, 108 F.3d at 492. This, however, was an additional reason for concluding that *Rooker-Feldman* is inapplicable when a plaintiff presents a claim in federal court that individuals involved in a state-court decision violated an independent constitutional right. We need not decide today whether this exception to the *Rooker-Feldman* doctrine remains good law following *Exxon Mobil*.

We find the reasoning of the Seventh Circuit persuasive and conclude that it applies here. As in *Nesses*, Great Western, by alleging a conspiracy between Defendants and the Pennsylvania judiciary to rule in favor of Rutter and ADR Options, is attacking the state-court judgments. But, like Nesses, Great Western is not merely contending that the state-court decisions were incorrect or that they were themselves in violation of the Constitution. Instead, Great Western claims that "people involved in the decision violated some independent right," that is, the right to an impartial forum. *Nesses*, 68 F.3d at 1005. The alleged agreement to reach a predetermined outcome in a case would itself violate Great Western's constitutional rights, independently of the subsequent state-court decisions. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."). "[B]ecause [Great Western's] claim for damages is based on an alleged independent violation of [its] constitutional rights," the source of Great Western's purported injury was the actions of Defendants and members of the Pennsylvania judiciary, not the state-court decisions themselves. *Brokaw*, 305 F.3d at 667. "It was this separate constitutional violation which caused the adverse state court decision" and the injury to Great Western. *Id.*; *accord McCormick*, 451 F.3d at 392. Thus, as the state-court judgments were not themselves the cause of Great Western's alleged injuries, the *Rooker-Feldman* doctrine did not deprive the District Court of jurisdiction over Great Western's claims.

The fact that Defendants' actions, rather than the state-court judgments, were the source of Great Western's injuries is alone sufficient to make *Rooker-Feldman* inapplicable here. Nevertheless, it is worthwhile to discuss the other key requirement—whether Great Western seeks review and rejection of the state-court judgments.

Regardless of the merits of the state-court decisions, if Great Western could prove the existence of a conspiracy to reach a predetermined outcome in state court, it could recover nominal damages for this due process violation. *Carey*, 435 U.S. at 262–64, 266. Great Western's entitlement to such damages could be assessed without any analysis of the state-court judgments. To recover for more than the alleged due process violation, however, Great Western would have to show that the adverse state-court decisions were entered erroneously. *See Nesses*, 68 F.3d at 1005. This is not the type of appellate review of state-court decisions contemplated by the *Rooker-Feldman* doctrine. In both *Rooker* and *Feldman*, the plaintiffs sought to have the state-court decisions undone or declared null and void by the federal courts. *See Rooker*, 263 U.S. at 414; *Feldman*, 460 U.S. at 468–69, 472–73. The relief requested by the plaintiffs in the federal courts would have required effectively overruling the state-court judgments. This is not the case here. Great Western may, "as part of [its] claim for damages," show "that the [constitutional] violation caused the decision[s] to be adverse to [it] and thus did [it] harm." *Nesses*, 68 F.3d at 1005. A finding by the District Court that state-court decisions were erroneous and thus injured Great Western would not result in overruling the judgments of the Pennsylvania courts. Pursuant to *Exxon Mobil*, a federal plaintiff may not seek "review and rejection" of state-court judgments. 544 U.S. at 284. Here, while Great Western's claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail. Accordingly, the review and rejection requirement of the *Rooker-Feldman* doctrine is not met, and the District Court properly exercised jurisdiction over Great Western's suit.

Ordinarily, having concluded our jurisdictional inquiry, the next step would be to apply state law to determine the preclusive effect of the prior state-court judgments. Defendants

did not raise the issues of res judicata or collateral estoppel in their motion to dismiss or before this Court. Estoppel, as an affirmative defense, may be raised in an answer and is not waived through failure to include it in a motion to dismiss. *See* Fed. R. Civ. P. 8(c), 12(h). Preclusion, however, is not jurisdictional. *Exxon Mobil*, 544 U.S. at 293. As the parties have not briefed this issue and as we can affirm the District Court on the merits, we need not reach the question of the preclusive effect of the prior state-court judgments. Instead, we turn to the merits of Great Western's arguments that the District Court erroneously denied its final motion for leave to amend the complaint and its motion for reconsideration.

### B. Motion for Leave to Amend

As we have discussed, after the District Court granted Defendants' motion to dismiss, Great Western filed a motion for reconsideration and a motion for leave to amend, attaching a draft amended complaint, Proposed Amended Complaint 1. While the motion for reconsideration was pending, Great Western filed two additional motions for leave to amend, each time attaching a new draft amended complaint—Proposed Amended Complaint 2, then Proposed Amended Complaint 3. In ruling on the motion for reconsideration, the District Court considered Proposed Amended Complaint 2, but not Proposed Amended Complaint 3. In a footnote, the District Court explained that "[t]o allow plaintiff to repeatedly submit drafts of its complaint while plaintiff's original motions are still pending would be prejudicial to defendants." (J.A. at 3.) Great Western challenges this ruling by the District Court.

Amendments to pleadings are governed by Federal Rule of Civil Procedure 15(a), which provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Interpreting Rule 15(a), the Supreme Court has held:

-28-

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962). As we have explained, "[d]istrict courts are the experts in the field of applied trial procedure, so appellate courts should not be quick to reverse . . . . That said, we also have acknowledged that the liberal pleading philosophy of the federal rules does limit a district court's discretion to deny leave to amend." *Bjorgung*, 550 F.3d at 266 (citing *Adams v. Gould*, 739 F.2d 858, 864 (3d Cir. 1984)). Further guiding district courts' exercise of discretion, we have held that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)).

The District Court concluded that allowing Great Western to submit a third proposed amended complaint would be prejudicial to defendants and denied leave to amend on this ground. We agree with Great Western that the District Court's

-29-

conclusion regarding prejudice was erroneous.[7]  Nevertheless, we will affirm the District Court on the ground that granting leave to amend would have been futile.  *See United States v. Sanchez*, 562 F.3d 275, 279 (3d Cir. 2009) (holding that an appellate court may affirm the result reached by the district court on alternative grounds, provided that the record supports the judgment).

---

[7] Although Defendants opposed Great Western's motions for leave to amend before the District Court, they did not argue that granting leave to amend would prejudice them.  Similarly, they do not make that argument in their brief on appeal.  They contend before us, as they asserted in the District Court, that granting leave to amend would be futile as all versions of Great Western's complaint failed to state a claim on which relief could be granted.  In denying leave to amend on the ground of prejudice, the District Court did not articulate specifically how permitting amendment would prejudice Defendants.  *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 276 (3d Cir. 2001) ("[T]he obligation of the district court . . . is to articulate the prejudice caused by the [amendment] and to balance those concerns against the reasons for [the amendment].").

Nothing in the facts of this case demonstrates any particular prejudice that would have resulted from allowing Great Western to substitute Proposed Amended Complaint 3, as long as the District Court had given Defendants an opportunity to respond.  We recognize that the District Court's conclusion that permitting Great Western to repeatedly amend its complaint would prejudice Defendants is entitled to substantial deference.  Nevertheless, in light of the record and the absence of a reasoned explanation of how Defendants would be prejudiced by the amendment, we conclude that the District Court erred when it denied Great Western's third motion for leave to amend on grounds of prejudice.

Under Rule 15(a), futility of amendment is a sufficient basis to deny leave to amend. Futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Merck & Co. Sec., Derivative, & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) (internal quotation marks & citation omitted). The standard for assessing futility is the "same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). In other words, "[t]he District Court determines futility by taking all pleaded allegations as true and viewing them in a light most favorable to the plaintiff." *Winer Family Trust v. Queen*, 503 F.3d 319, 330–31 (3d Cir. 2007) (citing *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 153–54 (3d Cir. 2004)). Typically, "[w]e review for abuse of discretion, and there is none where pleading deficiencies would not have been remedied by proposed amendments." *Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007) (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 280 (3d Cir. 2004)). In the instant case, however, the District Court did not consider whether permitting Great Western to amend and substitute Proposed Amended Complaint 3 would have been futile, thus our review is de novo, applying the same standard that would have been applied by the District Court.[8]

_____

[8] In the Order denying Great Western's motion for reconsideration, the District Court evaluated whether allowing Great Western to substitute Proposed Amended Complaint 2 would be futile. The District Court did not assess futility with respect to Proposed Amended Complaint 3, instead declining to consider that version on the ground that it would be prejudicial to Defendants. As we have noted, the refusal to consider Proposed Amended Complaint 3 on the basis of prejudice to Defendants was an abuse of discretion. We see no reason for remand, however, because for the reasons stated in our opinion, it is clear that substituting Proposed Amended Complaint 3

To determine whether the substitution of Proposed Amended Complaint 3 would have been futile, we consider the merits of Great Western's motion for reconsideration and the additional allegation contained in that version of the complaint. Specifically, we question whether the addition of the new allegation is sufficient to state a claim under 42 U.S.C. § 1983 such that the District Court should have granted Great Western's motion for reconsideration.

To prevail on a § 1983 claim, a plaintiff must allege that the defendant acted under color of state law, in other words, that there was state action. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). As relevant to this case, the Supreme Court has held that "[p]rivate parties who corruptly conspire with a judge in connection with [an official judicial act] are . . . acting under color of state law within the meaning of § 1983." *Dennis v. Sparks*, 449 U.S. 24, 29 (1980); *see also Lugar*, 457 U.S. at 941 ("[A] private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."). Thus, in order to state a claim under § 1983, Proposed Amended Complaint 3 must have adequately pled the existence of a conspiracy between Defendants, who are private parties, and the judges of the Pennsylvania court system.

In two recent landmark cases, the Supreme Court reexamined Federal Rule of Civil Procedure 8 and the pleading standards that a plaintiff must meet to state a claim that will survive a motion to dismiss under Rule 12(b)(6). The first of these two cases, *Bell Atlantic Corp. v. Twombly*, focused on "the proper standard for pleading [a Sherman Act] antitrust conspiracy through allegations of parallel conduct." 550 U.S. 544, 553 (2007). The Court reaffirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement

would be futile.

-32-

of the claim showing that the pleader is entitled to relief" and that this standard does not require "detailed factual allegations." *Id.* at 555 (internal quotation marks & citation omitted). Moreover, the Court reemphasized that at the motion to dismiss stage, the factual matter in the complaint must be taken as true and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id.* at 556.

In *Twombly*, however, the Supreme Court announced "two new concepts." *Phillips*, 515 F.3d at 231. First, the *Twombly* Court explained that Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." 550 U.S. at 555 n.3. In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alteration in original). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Second, the *Twombly* Court rejected the oft-cited *Conley* standard "'that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* at 561 (quoting *Conley*, 355 U.S. at 45–46). The Court retired this test as "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563.

Applying these general standards to the task of pleading an antitrust conspiracy, the Court explained that:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest

-33-

conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id.* at 556–57. Analyzing the complaint at issue, the Court held that it was insufficient as it failed to "set forth a single fact in a context that suggests an agreement." *Id.* at 561–62. Although the complaint alleged parallel conduct, it gave the Court "no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Id.* at 566. Finding an "obvious alternative explanation" for the parallel conduct, the Court concluded that the "plaintiffs here have not nudged their claims across the line from conceivable to plausible, [and] their complaint must be dismissed." *Id.* at 567, 570.

The second case, *Ashcroft v. Iqbal*, concerned allegations of discrimination on the basis of race, religion, or national origin in the wake of the September 11, 2001 terrorist attacks. — U.S. —, 129 S. Ct. 1937, 1942 (2009). The Supreme Court clarified that "[o]ur decision in *Twombly* expounded the pleading standard for 'all civil actions.'" *Id.* at 1953 (quoting Fed. R. Civ. P. 1). Analyzing *Twombly*, the *Iqbal* Court explained that "[t]wo working principles underlie our decision . . . . First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1949–50 (internal citations omitted). In light of these principles, the Court laid out a two-pronged approach:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that,

> because they are no more than conclusions, are not entitled to the assumption of truth. . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 1950. With respect to conclusory allegations, the Court clarified that "we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of [such] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 1951.

In light of *Twombly*, "it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'" *Phillips*, 515 F.3d at 233(quoting *Twombly*, 550 U.S. at 563 n.8) (alteration in original). Noting that "[c]ontext matters in notice pleading," we held that "some complaints will require at least some factual allegations to make out a 'showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 232 (quoting *Twombly*, 550 U.S. at 555). We summed up the *Twombly* pleading standard as follows: "'[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Id.* at 234 (quoting *Twombly*, 550 U.S. at 556). In other words, "there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Id.* at 234–35.

We have held that to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a

conspiratorial agreement can be inferred. *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1377 (3d Cir. 1992); *see also Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (stating that a conspiracy requires a "meeting of the minds") (further citation omitted). This holding remains good law following *Twombly* and *Iqbal*, which, in the conspiracy context, require "enough factual matter (taken as true) to suggest that an agreement was made," in other words, "plausible grounds to infer an agreement." *Twombly*, 550 U.S. at 556. Great Western's Proposed Amended Complaint 3 fails to meet this standard.

Under *Iqbal*, to assess the sufficiency of Proposed Amended Complaint 3, we "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. Accordingly, we do not consider any conclusory allegations that there was "a corrupt conspiracy," "an agreement," or "an understanding in place between the Defendants and the Philadelphia judicial system." (J.A. at 112, 119 [Proposed Am. Compl. 3, ¶¶ 2, 51].) As the *Iqbal* Court clarified, "we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . . It is the conclusory nature of [such] allegations" that makes them unacceptable. 129 S. Ct. at 1951.

The Supreme Court has held that "merely resorting to the courts and being on the winning side of a lawsuit does not make [the winning] party a co-conspirator or a joint actor with the judge." *Dennis*, 449 U.S. at 28. Instead, Great Western must plead an agreement between the state court judges and Defendants to rule in favor of ADR Options and Rutter. To properly plead such an agreement, "a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556.

Applying *Twombly*, Great Western's statement that "Defendants engaged in a concerted action of a kind not likely to occur in the absence of agreement" is inadequate to properly

plead an agreement. (J.A. at 120 [Proposed Am. Compl. 3, ¶ 55].) The factual allegations of agreement on which Great Western rests its claim are as follows: (1) according to Wiley, on or about March 1, 2006, Tintner stated that there was "no way that a Philadelphia court is ever going to find against Thomas Rutter given his relationship with the Philadelphia court system" (*id.* at 118 [Proposed Am. Compl. 3, ¶ 43]); (2) ADR Options is the largest provider of ADR services in Pennsylvania, has a large roster of former judges employed as arbitrators, and pays its arbitrators handsomely; and (3) in May 2009, Rutter testified at a deposition that some of the judges who had ruled for ADR Options and against Great Western had already approached him about employment after they leave the bench. Great Western alleges that these factual allegations, when viewed in concert with the decisions rendered by the Pennsylvania state courts, evidence "unnatural parallelism" and a quid pro quo relationship. (Great Western Br. 18, 20.)

At most, Great Western has alleged that Pennsylvania state-court judges hoped to secure employment with ADR Options after leaving the bench and thus had an incentive to rule in the company's favor. Fatal to its claim, however, Great Western failed to make any factual contentions concerning conduct by Rutter or any of the other Defendants. Specifically, even Proposed Amended Complaint 3 is devoid of allegations that Rutter or any of the Defendants did or said something to the judges to create an understanding that favorable rulings could result in future employment. Instead, the allegations in the complaint, even when viewed in the light most favorable to Great Western, describe unilateral action on the part of certain judges. For a judge to approach a party for whom he or she has just ruled to discuss the possibility of working for that party certainly creates a strong appearance of impropriety. Yet this allegation, without a complementary allegation of conduct by the non-judicial actor, does not plausibly suggest the existence

of a conspiracy between the party and the judge to exchange favorable rulings for future employment.

A comparison between the allegations in this case and those in *Dennis*, which the Supreme Court held were sufficient to survive a motion to dismiss, further emphasizes the deficiencies in Great Western's complaint. In *Dennis*, a state court enjoined the plaintiffs from producing minerals from certain oil leases. 449 U.S. at 25. The state appellate court dissolved the injunction as illegal, and the plaintiffs brought a § 1983 claim, contending that "the injunction had been corruptly issued as the result of a conspiracy between the judge and the other defendants, thus causing a deprivation of property . . . without due process of law." *Id.* at 26. Specifically, the plaintiffs claimed that the private party defendants had bribed the state-court judge to cause him to issue an injunction in their favor. *Id.* at 28. This alleged act of bribery was conduct by the non-judicial defendants that resulted in a corrupt conspiracy to rule against the plaintiffs. In contrast, Great Western's complaint contains no similar allegations of specific conduct by the non-judicial actors that caused the judges to enter into an unlawful conspiracy.

Furthermore, Great Western has not pleaded any facts that plausibly suggest a meeting of the minds between Rutter and members of the Pennsylvania judiciary. *See Twombly*, 550 U.S. at 556 (holding that a plaintiff claiming conspiracy must plead "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"). The complaint sets forth merely a "conclusory allegation of agreement at some unidentified point[, which] does not supply facts adequate to show illegality." *Id.* at 557. Specifically, Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement (i.e., which judges), the period of the conspiracy, or the object of the conspiracy. *See, e.g.*, *Shearin v.*

-38-

*E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989) ("To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose."), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000).

Great Western's Proposed Amended Complaint 3 lacks sufficient factual allegations to create "plausible grounds to infer an agreement," as is required by *Twombly*. 550 U.S. at 556. Any effort to amend by substituting Proposed Amended Complaint 3 therefore was futile, and we in turn affirm the District Court's denial of leave to amend on that ground.[9]

## IV.

For the foregoing reasons, we hold that the District Court properly exercised jurisdiction. We will affirm the District Court's denial of Great Western's motion for leave to amend and its motion for reconsideration.

---

[9] Great Western also appeals the denial of its motion for reconsideration, arguing that reconsideration was warranted based on previously unavailable evidence—Rutter's statement at the May 14, 2009 deposition—and the need to correct clear errors of law. Having thoroughly considered all of Great Western's arguments in favor of reconsideration, we conclude that they are without merit.